Kilty, Chan.
The Chancellor has considered the arguments of the counsel on each side in their notes in writing; and has examined the proceedings in the suit. Several grounds of defence are taken; first, that Pigman was in prosperous circumstances at the time- he purchased the goods from Gwinn, and remained so more than seven years after. It does not appear how *31 this can affect the right of the complainants; unless some fraudulent delay or collusion was proved to the injury of Penn.
The bond to Edward Gwinn was dated the 21st of September 1788, but was not payable until the 21st of September 1792. And although it seems to be admitted, that Pigman was the principal, and the other obligors the sureties; yet they all appear as principals in the condition of the bond.
Suits were not brought on the bond until April 1795; but such forbearance is not unusual, and does not affect the right of the obligee. And the sureties, if they thought proper to pay off the bond, might have had it assigned to them, and have brought suit against the principal. The judgments, against Pigman and against Charles Penn, were obtained at October term, 1796, with a stay of execution till the 1st of January 1797. The judgment against Pigman was removed in February 1797, as appears by the record, although the writ of error bond is left blank as to the dates; and admitting, that this bond was executed by Deakins and Stoddart to oblige Pigman, there is nothing suspicious in the transaction; and it appears also, that a similar bond was executed, about the same time, by Charles Penn, with the same sureties. Ediuard Gwinn died before November 1798, at which time his administratrix had appeared, and the judgment was affirmed. There is nothing to shew, that she was disposed to favour Pig-man; and it is presumed, that she would have recovered the money from him or Charles Penn, by execution, if in her power. But suits were brought against the executor of Deakins and against Stoddart on the appeal bonds, and judgments obtained thereon at May and October term 1801, against them as sureties for Penn, as well as for Pigman. The money was paid by them on the 1st of May 1802, and the judgment against Pigman only was assigned to them. This was the commencement of their claim against Charles Penn or his heir or representatives, and they filed the present bill in July 1802. It appears by the testimony of Benjamin Ray, that execution's were issued against Pigman, and Penn, which were both served, so that there was no neglect on the part of Gwinn to, pursue his legal remedy, supposing, that he was obliged so to do, which was not the case. If Pigman had been possessed of visible property, a resort to it would have been preferable to a suit on the writ of error bond. And as to Penn it is to be observed, that the conveyance of his lands in 1792, prevented their being taken on the judgment, and affirmance in 1798 and 1798, by which *32 the debt might have been satisfied, and the complainants relieved from their engagements.
It is also contended, that there was an intention to defraud at the time the conveyances were made. This point is not very clear on considering the time; which was in the year when the bond to Gwinn became due; and on adverting to the evidence of Benjamin Ray, and George Ray. But the Chancellor considers them as voluntary conveyances, which, though founded on a good and meritorious consideration as to his children, and grand children, were not bona fide as against creditors, but were a badge of fraud in legal contemplation; and so strong a one as not to require any further proof of the intention, the grant or being indebted at the time.
A third ground is, that the deeds were made to confirm gifts before made to the children, or in consequence of their being settled on the lands which their father had intended to give them. On this ground the Chancellor does not perceive, from the evidence, any acts or declarations, that would have obliged Charles Penn, the father, to make the conveyances; and even if he had gone so far as to make them, and had kept them in his own power, it would not have bound him.
The other ground, of the payment having been made to Deakins, is not supported by the testimony.
The Chancellor is, therefore, of opinion, that the complainants are entitled to relief against all the defendants; but the manner, and the proportionrin which they ought to contribute, he has not considered; nor the specific manner of granting the relief; both which will be determined, on the counsel for the complainant preparing a decree.
Nathan Waters, and Evan Gaither wmre named as defendants in the bill. There are no answers by them, and it is not perceived how they axe disposed of, although Evan Gaither’s will is among the papers.
After which, the case was again brought before the court by the plaintiffs, who asked for instructions as to the form of the final decree.
18th September, 1811. — Kilty, Chan. — The Chancellor has again examined the papers in this suit. It appears that Penn and Waters were equally liable; whether as principals in the bond to Gwinn, or as sureties. Waters was not taken on the writ against him, but his property might have been made liable.
*33 The appeal bond was given on account of Pigman, and a similar bond on account of Penn; but' the payment was made on a judgment on the appeal for Pigman, and the relief is prayed on the ground of substitution for Gwinn.
The object of the bill was to affect the land conveyed by Penn; and also that conveyed by Waters to Evan Gaither, who was made a defendant. And the prayer was, that' the aforesaid defendants might respectively pay, and contribute in satisfaction of the money paid by the complainants, such sums as might be proper.
The defendant, Gaither, is since dead, and has devised the land in question to the defendant, Waters ; and his wife, Susanna Waters, the sister of Gaither. Waters has not appeared; and an attachment, renewed in April last, for his appearance, has been returned non est.
Before a decree can be made, some further proceeding is necessary. Either, that Waters should, on application for amendment, be struck out of the bill, if the complainant’s counsel should think it safe and advisable to make such an application; or, that he should be compelled to appear; or the necessary orders be applied for, and passed for taking the bill, as against him, pro confesso : and also, that his wife, the other devisee, should be made a party in order to have her interest in the' land affected. After which the decree should be for a sale of the interest of Waters and wife for half of the debt; and Penn's for the other half, in the first instance; but leaving each eventually liable for the whole.
On the 19th of September 1811, the plaintiffs filed a bill of revivor, in which they stated, that Evan Gaither was dead, and, by his will had devised his interest in the property in dispute to JVathan Waters and Susanna his wife; against whom the plaintiffs- prayed relief,, a subpoena, &c.
24th March, 1812. — Kilty, Chancellor. — This case had been submitted on notes; but was considered by the Chancellor as not ready for decision for the reasons stated in his order of September 18th, 1811.
Since that time process has issued against JVathan Waters and Susanna his wife; and, such of the parties as appeared have been heard by their counsel at the present term.
The Chancellor finds no reason to change the opinions, which he had formed, and which were expressed by him in his order above referred to; and by his remarks in wilting, dated the 1st of May, and the 18th of September 1811; and will proceed to decree accordingly.
*34 Since the order of May 1st, 1811, a bill of revivor has been filed by the complainants, Hoye and Stoddart, against Nathan Waters and Susanna his wife, devisees of Evan Gaither, whose death is therein stated. The death of Susanna has since been suggested on the docket; but her interest is considered as surviving to Nathan Waters ; and, against him there has been an attachment, with proclamations, which enables the Chancellor to take the bill pro confesso against him.
With respect to the sums due, the Chancellor is of opinion, that as there was no decree to account, but only an agreement of the parties to have- the sum due stated; the sum of ¿£459 9s. 7id., charged as interest in the auditor’s statement, ought not to be made principal as is usual in other cases.
It is thereupon Decreed, that the bill of the complainants, as against Nathan Waters, be taken pro confesso. It is further decreed, that the real estate, stated in the bill to have been conveyed by Charles Penn, sen’r, and Nathan Waters, by the deeds, therein exhibited, be sold; or such part of each as may be necessary for the purposes hereinafter stated; that John Brewer of the city of Annapolis be and he is hereby appointed trustee to make sale thereof; and that the course and manner of his proceedings be as follows, to wit: he shall first give bond to the State of Maryland in the penal sum of 10,000 dollars with a surety or sureties to be approved by the Chancellor, conditioned for the faithful discharge of the trust reposed in him by this decree, or any other order or decree in the prefiiises. He shall then proceed to give notice, by advertisement in such newspaper or papers as hé may judge proper, for at least three successive weeks, of the manner and terms of sale; which shall be, that the purchaser or purchasers shall give bond with surety, to be approved by the trustee, for the payment of the purchase money, with interest -from the day of sale, within twelve months therefrom. The trustee shall then proceed, according to the notice, to make sale of the lands aforesaid at public vendue; or of so much thereof as will raise the sum of ¿£934 10s. 9id. current money, with interest thereon from the 1st day of May 1802, until paid, and tire costs of this suit, and the amount of the commission as far as the same can be estimated. And in determining on the quantity of each part, to be first sold, the trustee shall sell the land held by the heirs of Penn, in the first instance, to raise one half of the debt, costs, and commission; and shall sell the land devised to Nathan Waters, in the first instance, to raise the other half; as far *35 as this way may be found practicable; but, with power, according to the first part of this decree, to raise the amount by a sale of the whole at a succeeding period, if it can be done; or, in the first instance, if it should appear absolutely necessaiy; subject, however, to the ratification of this court. And the trustee shall return as soon as conveniently may be, a statement of his proceedings under this decree, with an affidavit of the truth thereof; and shall return the bond or bonds taken, and the money when received, to be applied according to the further order of the court. And on the ratification of the sales or any sale, and on the payment of the purchase money, and not before, the trustee shall convey to the purchaser or purchasers the lands so bought, free and clear from all claim of the defendants or any of them. And the trustee shall receive for his trouble such commission as the Chancellor shall consider him entitled to on a view of all the circumstances of the case. The sales to be on the premises respectively, unless any difficulties or inconveniences should occur to render such sales improper.
The defendant, Nathan Waters, by his petition, filed on the 13th of July 1812, stated, that he wished to appeal from the decree; and therefore prayed, that he might be admitted to appear so as to become a party for the purpose of prosecuting an appeal.
13th July, 1812. — Kilty, Chancellor. — The Chancellor has considered the within petition, and is of opinion, that the prayer thereof, to admit the petitioner to appear, ought not to be granted.
Nathan Waters nevertheless appealed, gave bond with sureties which was approved. And, at June term 1818, of the Court of Appeals, the decree was affirmed.
The trustee appointed to make the sale, reported, that he had, on the 23d of November 1818, with the consent of the possessors, sold the whole of the lands lying in Montgomery county which had been conveyed by the late Charles Penn, sen’r; and that the whole of the lands lying in Ann Aruiidel county which had been conveyed to the defendant Nathan Waters, he had sold to James Ferrée. The aggregate amount of sales being $10,711 50. The usual order giving notice, having been published, and no cause having been shewn to the contrary, these sales were, on the 26th of January 1819, absolutely ratified and confirmed.
*36 The auditor on the 26th of February 1819 reported, that he had examined the proceedings, and from them had stated an account between the estates of Charles Penn, sen’r, deceased, and Nathan Waters, and the trustee, in which the proceeds of each estate were applied to the payment of one half of the complainant’s claim and costs, and its proportion of the trustee’s allowance for commission and expenses; and the balances respectively were made payable to the said Nathan Waters, and to those entitled to claim under the said Charles Penn, sen’r, deceased. The auditor further reported, that his impression was, that the surviving grantees of Charles Penn, sen’r, were entitled to the balance of his estate in proportion to the quantity of land held by each in virtue of his several deeds. But, it not appearing which of his two children, Charles Penn, jun-’r, and William Penn, survived the other, he had not been able to make the distribution accordingly.
From this account, stated by the auditor, as of the 23d of November 1818, being the day of the sales, it appeared, that the amount of the sales of Penn’s estate was $4211 50; that the amount of the sales of Waters’ estate was $6500; and that the amount of the plaintiff’s claim, with interest up to that time, was $4968 43; leaving a surplus of the proceeds of the sales, after deducting all commissions and costs, of $1306 4¿, to be distributed among the grantees of Charles Penn, sen., deceased; and, the sum of $3515 6|, which was awarded to the defendant Nathan Waters.
6th March, 1819. — Kilty, Chancellor. — Ordered, that the above statement, as reported, be confirmed; and the proceeds applied accordingly; except the sum to be distributed among the grantees of Charles Penn, sen’r, which is reserved for further order. Interest to be paid on the commission, claim, and dividends, in proportion as it has been or may be received. After which, on the 25th of October 1819, the Chancellor again ordered upon this account, that the trustee, after retaining his commission and paying such costs above reported as may be still due to the officers, may deposit, to the credit of the estates, any sum in his hands, or to be received
It having been shewn, that Benny Penn had assigned a part of the land he had purchased of the trustee, to Lyde Griffith; and that William G. Penn had assigned a part of that which he had purchased to Caleb R. Penn, and Ann his wife; it was, on the 7th of July 1820, ordered, that, on the purchase money being paid, the trustee- convey according to those assignments.
*37 The plaintiff, John Hoye, on the 1st of February 1821, filed his petition, on oath, in which he stated, that he had agreed with the plaintiff, Stoddart, that he, Hoye, should be at all the trouble and expense of prosecuting this suit; and also another suit against Lloyd Beall, in which these plaintiffs were jointly interested; and, that he, Hoye, should be remunerated for all his expenses; and, also be allowed for his trouble a reasonable commission upon whatever should be recovered ; and, that he had accordingly prosecuted those.suits ; and had, for that purpose, expended in various ways the sum of $1154 40; that Stoddart, after the agreement with this petitioner, had assigned all his interest in those suits to Charles Gassaway, who had refused to contribute any thing towards the expense of prosecuting them; that Gassaway was dead, leaving William, Dame and Charles Gassaway his executors; that Stoddart was dead intestate, and no administration had been granted on his estate; and, that the auditor, in the account reported by him, had awarded the amount claimed by the 'plaintiffs to them jointly, without making any division of it between them. Whereupon the petitioner prayed, that this his separate claim might be allowed out of the amount so awarded to the plaintiffs jointly, &c.
At the same time the executors of the late Charles Gassaway, filed their petition, claiming the one half of the amount of the proceeds which had been awarded to the plaintiffs, for their testator, who was the assignee of the plaintiff Stoddart.
3d February, 1821. — Kilty, Chancellor. — On considering the above petition, it is Ordered, that the auditor state the claim of the petitioner, (Hoye,) giving notice and taking evidence in the usual manner. The application of the proceeds under the order of March 1819, (as to the petitioner and C. Gassaway’s executors,) to be suspended till further order. The order to be made on the above petition, (by Gassaway’s executors,) will depend on the decision on the petition filed by J. Hoye.
In pursuance of this order, the auditor reported, on the 6th of February 1821, that the petitioners, Hoye and Dame, had appeared before him, and come to an agreement, according to which, he had made a dividend of the amount allowed to the plaintiffs, between them, awarding to Hoye the sum agreed upon; which report of the auditor was immediately confirmed.
The defendant William G. Penn, filed two. petitions, in which he stated, that he was interested as a purchaser of a part of the lands *38 in Montgomery county; and also as one of the legal representatives of his late father, Charles Penn, sen’r; anlong whom it appeared, that there was a large surplus to be distributed. Whereupon he prayed, that the surplus might be distributed; and, that the share due to him might be deducted from the purchase money he had stipulated to pay, &c.
23d January, 1823. — Johnson, Chancellor. — I do not perceive by the proceedings, that the surplus ever has been divided. The auditor’s report of the 26th of February 1819, makes a surplus of $1306 4| to be distributed among the grantees of Charles Penn, sen’r, deceased;'but, who they are, or what proportion each is entitled to receive, don’t appear.
The exhibits filed with the petition of William G. Penn are too informal, and some of them want even the appearance of proof. An order, such as requested by the petitioner, don’t appear, at present, proper to pass. But on application, an order may be obtained for the auditor to state who are entitled to the surplus and the proportion of each; and then, on the petitioner obtaining their receipts to the trustee, given in conformity with the act of 1816, ch. 134, the trustee will be directed to execute a deed. In the mean time, to prevent the.petitioner, (who I presume is entitled to the whole surplus,) from being compelled to pay money to the trustee, that he may hereafter plainly appear entitled- to, an order may pass directing the trustee to suspend collecting that sum, with the interest, until further order.
Ordered, that the auditor state an account in which he will designate who, and in what proportion, are entitled to the surplus money mentioned in his report of the 26th of February, 1819, and report the same. The report to be made from such evidence as is in the case; and from such as may be laid before him. As the petitioner’s debt is suspended, and the time will not expire perhaps before the report of the auditor, it is thought premature to act on the latter part of the petition.
On the same day the auditor made a report, in which he says, that it appearing now by the deposition of Adam Darby, filed yesterday, that William Penn survived Charles Penn, jun’r, he had, in obedience to the order of to-day, and in conformity with his report of the 26th February, 1819, stated the within account with the trustee, for so much of the proceeds of the said estate, as by the account then reported, was reserved for distribution among *39 the grantees of the said Charles Perm, sen’r. The nett sum distributed, he had first apportioned to the lands conveyed by the deceased, and sold by the trustee, according to the sums raised by the several parcels; and then distributed each portion, among the surviving grantees of each parcel respectively; the deceased’s deeds having made them joint tenants -thereof. This report was, by an order of the 29th of January, 1823, confirmed, and the proceeds directed to be applied accordingly.
The trustee represented to the Chancellor, that Benny Penn, had now assigned the whole of the land which he had purchased, to Jjyde Griffith, who was his surety in the bond, given to secure the payment of the purchase money; that the land having sold for more than the debt due, a portion of the surplus was to go to Benny Penn, which sum Griffith wished not to be compelled to pay to the trustee, or to bring into court. Whereupon the trustee prayed the direction of the court.
24th April, 1823. — Johnson, Chancellor. — On examining the assignment from Benny Penn to Lyde Griffith, dated the 7th July, 1820,1 perceive, that Griffith is to pay the full purchase money and interest due thereon, before the trustee is to execute a deed. By the terms of the original decree, the trustee is restrained from giving a deed until the whole purchase money is paid; and therefore, without a special order to the contrary, must act accordingly. Griffith may have not only purchased the land from Penn, but at the time, it may have been agreed, that he was to have all the interest Penn had in the estate; if so, and Penn, and himself will join in an application, the sum due to Penn may, by an order, be placed to the credit of Griffith ; and a deed directed on the trustees receiving the balance; otherwise, in the language of the assignment, he must pay the full purchase money and interest.
After which, Benny Penn again moved to obtain further instruction as to the distribution of the proceeds and the amount to be paid by Griffith, &c.
16th June, 1823. — Johnson, Chancellor. — Mr. Benny Penn will present this to the trustee, who is willing that Mr. Griffith should come to a settlement on payment of the purchase money, deducting the amount, according to the statement of the auditor, that is due to him. Let the trustee take Mr. Penn’s receipt for the sum thus appearing due to him, and that amount Mr. Griffith can have deducted from the purchase money. Roby Penn appears, by the *40 report of tbe auditor, to be equally entitled to tire sum of $511 14, stated in the report of the auditor, as the proportion of Benny Penn and Roby ; and he, I am informed, is willing to make a deduction on account of his having before sold part of the land to Fielder Parker ; Roby Penn is not in the State, but has left a person authorized to act for him. On the trustee’s obtaining the receipt of the agent for the amount appearing due to Roby, that also can be passed to the credit of Mr. Griffith ; and he and the agent can then settle between them. B.y this course, the trustee’s proceedings in this Court will comport with his trust.
Roby Penn and Betsy Penn, then residents of the State of New York, gave a power of attorney to Benjamin Willet, authorizing him to receive their dividends ; which power of attorney was executed before a magistrate of the county, in New York, where they resided; and further authenticated by a certificate, under the seal of the county, that the magistrate was properly commissioned as such at the time.
23d June, 1823. — Johnson, Chancellor. — Ordered, thatthe trustee be authorized to settle with the attorney Willet.(a)
James Feme, Abraham Feme, and Basil Warfield, with the trustee, filed their petition, in which they stated, that to secure the payment of the purchase money for the lands in Anne Arundel county, which had been sold to James Ferrée, he had given bond, with Abraham Feme and Basil Warfield as his sureties; that James had sold his interest in the land to Abraham; that the trustee, having brought suit and obtained judgment on the bond, had sued out a fieri facias, which, having been levied on the land, so sold to James, it had been accordingly advertised to be sold; that if sold by the sheriff for cash, it would not sell for more than one third *41 of its value; and that a sale on terms would be more advantageous to all concerned. Whereupon these petitioners prayed, that the land might be decreed to be sold upon such terms as might be deemed proper, &c.
25th October, 1823. — Johnson, Chan. — It is not perceived, that there is any necessity for a decree on the subject of this application; but the trustee is authorized to suspend the sheriff’s sale; he is the legal creditor, and has the control over the judgments, and can give such directions as shall appear most advisable, as the person who has the equitable title, the trustee, through whom the legal title must pass, believes it will be most advantageous for the property to be sold by the trustee, any sale they may make, not prejudicial to the interest of the complainants, will be confirmed. The trustee having made the sale, will report the same subject to the order of the Court; if convenient, he will consult the complainant interested as to the terms of sale.
On the 9th of June, 1824, the plaintiff, Hoye, and William Dame and Charles Gassaway, executors of the late Charles Gassaway, who was the assignee of the late Benjamin Stoddart, filed their petition, in which they stated, that the land which had belonged to JYathan Waters ; and which had been sold to James Ferfée for more than enough to pay one half of the debt dúe to the plaintiffs, having been ordered to be resold, because of the non payment of the purchase money by Ferrée, had been resold accordingly; but, that in consequence of the depreciation of land, and the scarcity of money, it had not, on the resale, sold for a sufficiency to discharge one half of the debt due to the plaintiffs; that the purchaser, Ferrée, and his sureties, were insolvent; that the trustee was about to pay the surplus of the. proceeds arising from the sale of the estate of the late Charles Penn, sen’r, to his grantees and legal representatives; which surplus was liable to these petitioners to make up the deficiency due to them, resulting from the resale of Waters’ estate, and the insolvency of the purchaser thereof, and his sureties.(b) *42 Whereupon the petitioners prayed, that the trustee might be prohibited from making any further payments to the grantees or heirs *43 of the late Charles Penn, sen’r; and, that their claim might be first fully satisfied out of the surplus of the' proceeds of the sale of Penn’s estate.
9th June, 1824. — Johnson, Chancellor. — Ordered, that the trustee do not pay to the representatives of Charles Penn, or their orders, any further sums of money without the further order of the Court, or to any other person claiming to represent them, or to allow any other credits on account of any receipts the representatives may have or shall give; provided a copy of this order is served before the payment.
The,trustee, on the 11th of June, 1824, reported, that under the authority of the order of the 25th of October, he had, on the 7th then instant, resold the tract containing 285 acres, of which James Ferrée had been the purchaser, for $10 50 per acre, amounting to $2992 50; which sale was , absolutely ratified on the 14th of March, 1826.
The matter of the petition of Hoye and others, filed on the 9th of June, having been brought before the Court, the solicitors of the parties were fully heard. ,
28th February, 1825. — Bland, Chancellor. — In, this case, the lands of two debtors, Waters and Penn, have been sold under a decree of this Court, to pay the proportion due from each of a joint debt. The proceeds of the sales thus made, were reported to be more than sufficient to answer the whole demand., The securities for the purchase money were the lands themselves, and the purchasers with personal securities. The purchaser of Waters’ land being, as is alleged, unable to pay, or insolvent;- that land itself was again sent into the market; .but owing to the general depreciation of such property, it has not sold for any thing like the original purchase money, or indeed a sufficiency to pay the proportion of the debt with which Waters was charged.
But, when the property was taken out of the hands of Waters, and sold, the parties tacitly conceded, and the Court solemnly adjudged, by confirming the trustee’s report, and thereby divesting Waters of his real estate, and converting it, for the purposes of this suit, into personalty,(a) that a sufficiency of his property had been taken to pay the debt due .from him. This debt, as to him, was thep satisfied; for his property having been disposed of, by *44 the Court; and, being entirely under its control, he, the original debtor, cannot be held bound as an insurer of its sufficiency or safety, and liable for any loss that has happened to the fund which has been so taken into the custody of the Court. For, it is a general rule, that where a loss happens by the failure of a trustee appointed by creditors, they must bear it; but where a loss happens from the default of a receiver or trustee, appointed by the Court, or from any failure in the direction of the Court itself, the estate must bear it. (b) To seize any more of Waters’ property, in such a case, would be to make him pay his debt over again.
It is said, however, that there is an unappropriated surplus of the proceeds of Penn’s property in court; and that, Penn and Wafers being.jointly liable, that surplus may be applied to make good the ultimate deficiency in the proceeds of the sale of Waters’ property. But, according to the decree of the 24th of March, 1812, which has been affirmed by the Court of Appeals, and is founded upon the clearest principles of law and .equity, these two obligors, Penn and Waters, were held bound to contribute to the satisfaction of this debt in equal proportions, so far as such just contribution could be enforced without prejudice to their creditors.(c) And that contribution having been effected, by the sale of their respective estates, without delay or prejudice to these plaintiffs, was, as to Penn and Waters respectively, a complete satisfaction of the debt. Now, if it would be unjust, as we have seen it would be, to take any more of Waters’ property to make good this deficiency, it cánnot be at all equitable to take Penn’s property for that purpose; since Penn and Waters, as to this debt, being jointly liable, are as one and the same debtor; and. consequently Penn’s property cannot be touched on any principle which would not, in like manner, authorize the taking of Waters’ property.
The confirmed report of the trustee shews, that more than enough of Waters’ property had been'sold; and consequently he is a claimant to the amount of the surplus stated to have arisen from that sale; and is, in that respect, a creditor of the fund taken by the Court, who must be permitted to stand here upon as high ground as those creditors who brought him here as a defendant; and to satisfy whose claims the Court had taken this, his property. Therefore, if there should be -any deficiency, in collecting the proceeds of the sale of the property of Waters, which has been resold, such loss must be *45 borne pro rata; that is, by Waters, in proportion to his surplus, and by his creditors in proportion to their several established claims.
It has been laid down as a clear law, that when a sheriff seizes goods, by virtue of a fieri facias, to the value of the debt, the defendant is actually discharged, though they are not sold; for the plaintiff must depend upon his execution, and rely upon that; and he has no further remedy against the defendant, but altogether against the sheriff; and the defendant having-lost his goods upon an execution, which the plaintiff himself has chosen, the goods are in the custody of the' law, and the defendant discharged. Upon similar principles, it may be regarded as a general rule in equity, that where the property of a debtor has been sold, under a decree, to pay his debt, and the report of the trustee, as finally ratified, shews, that enough of the debtor’s property has been taken and sold to satisfy such claim fully, the debt, as relates to the debtor, must be considered as satisfied; and no subsequent failure, from any cause whatever, in collecting the full amount of the proceeds of such sale, can justify the original creditor in again resorting to his debtor, and making a further seizure, after his property had been thus taken and sold to an amount equal to the debt.(d)
Whereupon it is ordered, that the several receipts or assignments of the respective representatives o'f the late Charles Penn, sen’r, be, and the same are hereby allowed in favour of the assignees claiming under them; and, that the trustee apply the proceeds as heretofore directed by the order of the 29th of January, 1823; and further, that the petition of John Hoye and others be, and the same is hereby dismissed, with costs.
From this order there was an appeal, and the order was reversed by the Court of Appeals, at June term, 1828. — Hoye v. Penn, 2 H. & G. 477.

 So in England, money has been directed to be paid to an attorney in fact, on a power made in Paris, and duly authenticated, 1 Mad. Rep. 227; and, in some cases there, it has also been ordered to be paid to the solicitor of the party entitled to it, without any special order from the party himself; 1 Salk. 157; Doug. 623; 1 Blac. 8; 1 T. R. 710; Prec. Chan. 209; Jac. Rep. 48. Here, on a person’s producing a power, authenticated under the notarial seal of a notary public of Leghorn, attested by the consul of the United States, at that port, with a translation, the claim, amounting to $2373 77, was ordered to he paid to him as attorney in fact of the claimant.. — Taylor v. Casanave, MS. 12th November, 1817. But it is usual to order payment of small sums on the written draft filed of a resident claimant, or that the money be paid to his solicitor in the case to any amount, because of all the parties being within reach and under the control of the Court. — Henck v. Todhunter, 7 H. & J. 275; Munnikuyson v. Dorsett, 2 H. & G. 374; Branch v. Burnley, 1 Call. 147.

 The South Sea Company of England was created in the year 1710, under the sanction of a statute, (9 Anne, c. 21,) and had had its connexion with the government, from time to time, extended until the year 1719, when, by means of various misrepresentations and fraudulent practices, an act was passed, (6 Geo. I., c. 4,) declaring, that its capital stock should be increased, and its franchises new-modelled, by which it was almost immediately made the means of spreading' abroad one of the most mischievous delusions that ever beset a civilized people. All ranks and classes were led -to believe, that immense wealth was to be at once acquired by this South Sea *42 scheme. The value of all things was raised to a great height; but immediately that the bubble burst, property returned to its true value, and the stock of the company sunk almost to nothing. Multitudes were totally ruined; many became insane from their disappointments and losses, and the whole nation was plundered. — (Smollet’s His. Eng. b. 2, c. 2, s. 26; Shel. Lun. Intr. 61.) As might have been expected, the administration of justice was not allowed to proceed in its regular course, altogether unaffected by this strange and pernicious infatuation. In many cases, where sales had been made under the authorily of the Court of Chancery, purchasers Were unable "to comply with, or were ready to malee the greatest sacrifices to disengage themselves from, their contracts. “A court of equity,” said the Chancellor, in spealdng of a sale made during this period, “ ought to take notice under what a general delusion the nation was when this contract was made, when there was thought to be more money in the nation than there really was, which induced people to put imaginary values on estates.” — (Savile v. Savile, 1 P. Will. 746; 2 Eden, 198.)
Causes somewhat similar, which were in operation at the time the sale and the resale mentioned in this case were made, were attended with similar effects. In a report made by the Secretary of the Treasury, it is, among other things, stated, that the whole amount of money, metallic and paper, in circulation within this Union, in the year 1815, might be safely calculated at not less than one hundred and ten millions of dollars, which was probably augmented in 1816; but at the close of the year 1819, it had been estimated, upon data believed to be substantially correct, at forty-five millions of dollars. According to these estimates, the currency of the United States had, in the space of three years, been reduced from $110,000,000 to $45,000,000 ; a reduction exceeding fifty-nine per cent, of the whole circulation of 1815. “A change so violent could not fail,” says the Secretary, “ under the most favourable auspices in other respects, to produce much distress, to check the ardor of enterprise, and seriously to affect the productive energies of the nation.” And again, says the Secretary, “ As there is no recorded example, in the history of nations, of a reduction of the currency so rapid, and so extensive; so but few examples have occurred of distress so general, and so severe, as that which has been exhibited in the United States.” — (Report of W. H. Crawford to the House of Represent. 12th February, 1820, pages 8 & 9; Niles’ Reg. 114.) It was found, at the close of the war of 1814, that the State Banks had inundated the country with their paper; and, instead of the evil having been corrected by the Bank of the United States, it is stated, upon good authority, that they increased it by their extensive discounts and issues to stockholders — (Report Com. House Repr. to examine into the proceedings of the Bank, 16th Jan. 1819, page 8,) — until, by theonatural and wholesome influence óf a renewed foreign commerce, and the curtailment .of their discounts, the State Banks were enabled to resume specie payments, and the development of the peculations and frauds of those who had, at that time, obtained the management of the Bank of the United States, and the crippled and powerless condition of that institution, left all property free to return to its proper and real value. — (Report Cond. Bank, 49; Letter 2, April, 1819, from Pres. Cheves to Seer. Crawford; North Amer. Review, January, 1831, art. 2.) A recollection of these circumstances seemed to be necessary to a distinct understanding of the nature of the extraordinary depreciation spoken of in this case, and to shew how it happened, that, when this sale was made to Ferrée, in November, 1818, people had been induced “ to put imaginary values on estates by which so many who purchased about that time were afterwards totally ruined. (Chancellor’s case, post, note (q).

 The State use Rogers v. Krebs, 6 H. & J. 31.

 Hutchinson v. Lord Massarene, 2 Ball & Bea. 49; The Rendsberg, 6 Rob. Adm. Rep. 156.

 Herbert’s case, 3 Co. 13; Wright v. Simpson, 6 Ves. 734.

 The King v. Hopper, 3 Price, 40; Wilbraham v. Snow, 2 Saund. 47, n. l; Clerk v. Withers, 2 Ld. Raym. 1072; S. C. 6 Mod. 299; Ex parte Minor, 11 Ves. 559; Beatty v. Chapline, 2 H. & J. 7.